# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

CHAD A. ALEX          *          CIVIL ACTION
                                             *
                                             *          NO. 07-9183
                                             *
WILD WELL CONTROL, INC. ET AL      *          SECTION "L"(5)

## ORDER & REASONS

Before the Court is the Motion for Summary Judgment filed by O'Brien's Group Inc. (Rec. Doc. No. 29), the Motion for Summary Judgment filed by Newfield Exploration Company (Rec. Doc. No. 84), the Motion for Summary Judgment filed by Longnecker Properties, Inc. (Rec. Doc. No. 85) and the Motion for Summary Judgment filed by Blowout Tools, Inc. and Wild Well Control, Inc. (Rec. Doc. No. 108). The Court, having reviewed the arguments of counsel, the record, and applicable jurisprudence, is fully advised and now ready to rule.

## I.      BACKGROUND

This case arises out of injuries sustained by the Plaintiff aboard the M/V TOISA PROTEUS. The Plaintiff, an employee of Defendant Longnecker Properties, Inc. (hereinafter "Longnecker"), was a member of the crew of the M/V TOISA PROTEUS, allegedly chartered by Defendant Newfield Exploration Company (hereinafter "Newfield"). The vessel was engaged in a project to salvage a submerged offshore oil platform known as Marsh Island 39B that had been destroyed as a result of Hurricanes Katrina and Rita. The project involved the use of a crane mounted on the vessel to lift pieces of a fixed platform, which was located on the Outer

1

Continental Shelf (hereinafter "OCS") off the coast of Louisiana, from the sea floor and place them on an adjacent barge. All work was accomplished from the vessel and barge.[1] The M/V TOISA PROTEUS was a dynamic positioning vessel that was never permanently or temporarily attached to the seabed.[2]

The Plaintiff claims he was injured on two occasions while working as a rigger in the course and scope of his employment. The Plaintiff alleges that he was injured on or about November 19, 2006, when the vessel's crane dropped a personnel basket onto Plaintiff's right hand. The Plaintiff also alleges that on December 11, 2006, the vessel's crane block struck an unsecured staircase, causing the staircase to flip over and strike the Plaintiff, resulting in injuries to the Plaintiff's ribs, shoulders, neck and back. The Plaintiff sued his employer pursuant to the Jones Act and other Defendants under the General Maritime Law, seeking maintenance and cure, attorney's fees, past and future earning capacity and other damages from all Defendants jointly and in solido.

On May 6, 2008, the Plaintiff filed an amended complaint naming Sealion Shipping Limited (hereinafter "Sealion"), the operator of the vessel, and Toisa Limited, the owner of the vessel as defendants.[3]

The Defendants have answered and denied liability. On October 17, 2008, Newfield

---

[1] *See* Rec. Doc. No. 29-2.

[2] A dynamic positioning vessel is held in place not by anchors or other attachments to the sea floor, but by a computer system which controls the vessel's direction and position through the vessel's thrusters.

[3] *See* Rec. Doc. No. 9.

Exploration Company filed a Crossclaim against Defendant Longnecker, Plaintiff's employer.[4] Newfield alleges that there was a contract (the "MSC")[5] between Newfield and Longnecker that required Longnecker to perform its work in a safe and proper manner, and to indemnify Newfield for any liability arising out of the performance of the contract. The MSC also required Longnecker to obtain liability insurance. Longnecker has responded to the Crossclaim, alleging that all insurance and indemnity provisions in the contract are void pursuant to the Louisiana and/or Texas Oilfield Anti-Indemnity Acts.

On September 17, 2008, the Plaintiff filed a second amended complaint naming the O'Brien's Group, Inc. ("O'Brien's"), provider of the Deck Safety Officer aboard the M/V TOISA PROTEUS, as a Defendant.[6] O'Brien's provides services such as response management and preparedness for land facilities and vessels. Newfield hired O'Brien's through a master service agreement (the "Contract") to provide safety services in connection with the salvage project.[7] At the time of the accidents, an on-site safety professional provided by O'Brien's, Mark Campbell Jones, was aboard the M/V TOISA PROTEUS to provide safety consultation on the vessel and barge. O'Brien's answered the complaint, denying liability, and filed a Crossclaim[8] against Newfield alleging that pursuant to the terms of the Contract Newfield was obligated to defend and indemnify O'Brien's for such injuries.

---

[4]*See* Rec. Doc. No. 28.

[5]Master Work or Service Contract No. DP329, Rec. Doc. No. 108-2.

[6]*See* Rec. Doc. No. 20.

[7]*See* Rec. Doc. No. 29-5.

[8]*See* Rec. Doc. No. 26.

On January 13, 2009 and April 6, 2009, the parties filed cross-motions for summary judgment regarding the Plaintiff's seaman status.[9] On May 28, 2009, the Court denied Longnecker's motion and granted Plaintiff's motion on the issue of Plaintiff's seaman status. The Court found that when a Plaintiff spends 30% or more of his time as a member of the crew of an identifiable fleet of vessels under common ownership, he satisfies the requirement for seaman status even though those vessels were not owned by the employer of the seaman.

## II.        THE MOTIONS

O'Brien's has filed a Motion for Summary Judgment urging the Court to find that pursuant to the master service agreement, Newfield is obligated to protect, defend and indemnify O'Brien's from the claims of the Plaintiff, an employee of one of Newfield's contractors. O'Brien's contends that Newfield has refused to indemnify O'Brien's on the grounds that the contract is non-maritime, the contract is subject to state law by virtue of the Outer Continental Shelf Lands Act, 43 U.S.C. 1331 ("OCSLA"), and thus the indemnification provisions are void under Louisiana law. To the contrary, O'Brien's asserts that General Maritime Law applies and the indemnity agreement between O'Brien's and Newfield is valid.

In response, Newfield argues that the work performed by O'Brien's consultant was not within the scope of the contract that contained the indemnity clause. Even if the contract is applicable, the indemnity provision does not extend to Jones, a contractor or subcontractor for O'Brien's. Finally, if the Court finds that Louisiana state law applies to the contract between Newfield and Longnecker such that Longnecker's indemnity obligations to Newfield are void by the Louisiana Oilfield Indemnity Act (hereinafter "LOIA"), then Newfield argues that any

---

[9]*See* Rec. Doc. Nos. 34 and 51.

indemnity obligations owed by Newfield to O'Brien's are also voided by the LOIA.

Newfield also seeks summary judgment finding that Newfield's claims for indemnity against Longnecker are valid and enforceable. Newfield seeks indemnification for claims asserted by Alex, an employee of Longnecker, as well as for its contractual agreements to indemnify third parties, including co-Defendants Toisa and Sealion.

Defendants Wild Well Control, Inc. ("Wild Well") and its subsidiary, Blowout Tools, Inc. ("BTI") have also filed a motion for summary judgment for contractual defense and indemnity against Defendant Longnecker. Pursuant to a Master Work or Service Contract No. DP329, Wild Well and BTI worked for Newfield to assist in the salvage of the remnants and debris from the wrecked platform. Wild Well and BTI assert that pursuant to the terms of the MSC executed between Longnecker and Newfield, Longnecker was obligated to defend and indemnify Wild Well and BTI. Adopting arguments submitted by Newfield and O'Brien's, Wild Well and BTI also assert that maritime law applies of its own force to the contract and subsequent work orders between Longnecker and Newfield, and thus, the indemnity provision is valid and enforceable.

In response, Longnecker asserts that the defense and indemnity obligations in the MSC between Longnecker and Newfield are voided by the LOIA. Longnecker argues that the fact that the work was performed from a vessel is not dispositive. Longnecker urges the Court to focus on the subject matter of the contract, which involved the deconstruction of a platform within the Outer Continental Shelf. The project was integral to the development and production of resources on the OCS. Thus, because the work involved satisfies the situs test, and the historical treatment and *Davis* factors regarding platform deconstruction indicate that the

contract was non-maritime, state law applies through the OCSLA and the indemnity provision is thus void and unenforceable. Further, Longnecker asserts that Wild Well and BTI have no rights under the Newfield/Longnecker MSC because neither Wild Well nor BTI are parties to that contract.

## III.　　　LAW & ANALYSIS

Summary judgment is appropriate in a case if "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "The moving party bears the burden of demonstrating that there exists no genuine issues of material fact." *In re Vioxx Products Liability Litigation*, 501 F.Supp.2d 776, 781 (E.D. La. 2007). In determining whether a genuine issue of material fact exists, the Court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004). But because "only those disputes over facts that might affect the outcome of the lawsuit under governing substantive law will preclude summary judgment," questions that are unnecessary to the resolution of a particular issue "will not be counted." *Phillips Oil Co. V. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987).

The laws governing the interpretation of a contract differ for maritime and non-maritime contracts.  The interpretation of an indemnity clause in a *maritime contract* is ordinarily governed by federal maritime law rather than by state law. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir. 1981). Under either federal maritime law or state law, however, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Id*. at 333-34; *see also Ortega v. State, Dept. of Transp. and Development*, 689 So.2d 1358, 1363-1364 (La. 1997)

(Under Louisiana contract law, parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous.); La. Civ. Code Ann. art 2046 ("When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."). An indemnity provision should not be construed "to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt*, 654 F.2d at 333. This statement, regarding federal law, is consistent with the law of Louisiana regarding indemnity clauses. *See McKinney v. South Cent. Bell Telephone Co.*, 590 So.2d 1220, 1225 (La. App. 1st Cir. 1991).

## A. Whether O'Brien's is Entitled to Indemnity

Newfield asserts that the Contract containing the indemnity clause between Newfield and O'Brien's was for oil spill response, not for a safety consultant. Thus, according to Newfield, the indemnity clause does not apply to O'Brien's services in the instant case. Further, Newfield claims that it is not required to indemnify the contractors or subcontractors of O'Brien's, such as Jones.

Indemnity provisions should not be interpreted to impose liability for losses that are not expressly within the terms of the agreement or are not reasonably inferred from the language of the agreement. *Corbitt*, 654 F.2d at 333 (5th Cir. 1981). In the instant case, the indemnity clause of the agreement between O'Brien's and Newfield, entitled "Contract for Oil Spill Response Consultation Services" (the "Contract") states,

> ""To the fullest extent permitted by law, Operator shall protect, defend, and
> indemnify Consultant, its affiliated companies, directors, stockholders, owners,

officers and employees for claims for compensatory damages relating to personal injuries or death sustained by employees of Operator, its contractors, subcontractors, invitees, agents or representatives, in connection with the performance of this contract..."

The Contract states that the agreement "is entered into between Newfield Exploration Company hereinafter referred to as 'Operator,' and O'Brien's Oil Pollution Service, Inc., hereinafter referred to as 'Consultant.'"

Newfield takes the position that O'Brien's is not entitled to indemnity because Jones is a contractor for O'Brien's, and the Contract does not explicitly state that Newfield must indemnify contractors or subcontractors of O'Brien's. Newfield's contention is, in the eyes of the Court, misplaced. O'Brien's is not seeking indemnity for its contractors, it is seeking indemnity for itself. The Contract clearly extends indemnity protection to O'Brien's, referred to as the Consultant. Thus, the above-cited section is applicable and O'Brien's is entitled to indemnity if the work at issue was within the scope of the Contract.

Citing Jones' deposition testimony stating that he investigated accidents, observed the operations and presented safety issues daily, Newfield argues that Jones' duties on behalf of O'Brien's had nothing to do with oil spill response consultation services, therefore his work was outside the scope of the contract at issue. The Contract states in Article 1 "[Newfield] hereby retains [O'Brien's] and [O'Brien's] hereby agrees to provide consultation services in connection with oil spill response operations of [Newfield] including spill management team functions as required."[10] Newfield cites Jones' deposition testimony as evidence that Jones did not provide oil spill response consultation services:

---

[10]Rec. Doc. No. 94-1.

Q: Describe for me your job duties on that project, just generally.
A: I was responsible to - from when someone came on the vessel, I would give them an induction for the project. And they'd also get an induction from the ship's officer. On a daily basis, I would present safety issues at the 1130 and/or the 2330 meeting, depending on what shift I was working. During the course of my watch, I would walk around the deck observing operations, ensuring that procedures were being followed, that there were no conflicting jobs being performed. In the cases of any accidents, we would do the investigations. I would maintain the records for the safety observation program and identify any unsafe trends.
...
Q. Have you ever acted on a job as a consultant for oil spill response?
A. No. My job with O'Brien's was I worked on one of their smaller boats, and I supervised the crew that would launch equipment. We had three boats, and the lead man was on one of the boats, and he would call me up and tell me what to do. He was the manager...[11]

The Contract states, "During the Service Period, Consultant shall provide the consultation services as necessary in the event of an oil spill or the substantial threat of an oil spill from one of Operator's sites, locations or operations....Consultant shall exercise reasonable and customary discretion and independent judgment with respect to the services provided pursuant to this Agreement." This appears to confer broad responsibilities upon the Consultant (O'Brien's) such that Jones' work could fall within the scope of the work contemplated by the Contract. However, the Contract does not define "oil spill response consultation services." O'Brien's has attached a Declaration from Courtney Allen Benson, vice president of response services for O'Brien's, stating that on-site safety consultation is included in any services rendered pursuant to the Contract. However, Jones has testified that he has never acted as a consultant for oil spill response. This gives rise to factual issues as to whether Jones' work on behalf of O'Brien's, the reason O'Brien's has been sued, fell within the scope of the Contract. Thus, as

_____

[11]Rec. Doc. No. 94-1.

factual issues exist as to whether the services provided by O'Brien's, through Jones, was subject to the indemnity agreement, the Court denies O'Brien's motion for summary judgment.

**B. Whether the Longnecker-Newfield MSC is subject to the Louisiana Oilfield Indemnity Act ("LOIA")**

When a contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions. *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 315 (5th Cir. 1990). "The actual contract between the parties therefore consists of the blanket agreement as modified by the later work order." *Id.*

In the instant case, the Longnecker -Newfield MSC consists of a blanket Master Work or Service Contract entered into on November 15, 2005, and a verbal work order. The MSC between Longnecker and Newfield does not describe the work to be performed by the agreement, but it does incorporate its terms into any subsequent verbal or written work orders. No work order applicable to the work performed by Alex is available.

The MSC states that Longnecker shall indemnify Newfield for claims arising out of injuries to any employee of Longnecker when the injury arises out of the work to be performed under the contract.[12] The MSC further states that Longnecker will indemnify Newfield for contractual liability under indemnity agreements Newfield has with third parties. Alex was an employee of Longnecker. Thus, pursuant to the MSC, Longnecker would be required to indemnify Newfield for claims arising out of Alex's injury, and for claims arising from Newfield's agreement to indemnify Defendants Toisa and Sealion.

---

[12]*See* MSC, Rec. Doc. No. 84-5.

Newfield asserts that Longnecker was furnishing labor and performing rigging activities aboard the M/V TOISA PROTEUS on navigable waters in connection with the salvage operations. Longnecker asserts that its contract was to provide services for salvage operations to remove a platform embedded in the OCS. The dispute concerns whether the indemnity provision is part of a maritime contract subject to general maritime law, or whether it is subject to state law through operation of OCSLA. Louisiana law, through the Louisiana Oilfield Indemnity Act[13] ("LOIA"), prohibits enforcement of the indemnity provision while the general maritime law allows it.

The Outer Continental Shelf Lands Act ("OCSLA") provides comprehensive choice-of-law rules and federal regulation to a wide range of activity occurring beyond the territorial waters of the states on the Outer Continental Shelf of the United States. The term "Outer Continental Shelf" (hereinafter "OCS") means all submerged lands lying seaward and outside the area of lands beneath navigable waters, as defined in a provision of the federal laws concerning submerged lands, and whose subsoil and seabed appertain to the United States and are subject to its jurisdiction and control. 43 U.S.C. §1331. OCSLA "applies federal law to certain structures and devices on the OCS, [and] incorporates state law into federal law on the OCS[,]" to the extent they are not inconsistent. *See Demette v. Falcon Drilling Co., Inc*., 280 F.3d 492, 496 (5th Cir. 2002). For state law to apply as a surrogate to federal law, under the OCSLA, the Fifth Circuit requires satisfaction of the following three-part test:

(1) The controversy must arise on a situs covered by the OCSLA (i.e., the subsoil, seabed, or artificial structure permanently or temporarily attached thereto);

---

[13]La. Rev. Stat. § 9:2780.

(2) Federal maritime law must not apply of its own force;

(3) The state law must not be inconsistent with the Federal law.

*Id.* at 497 (citing *Union Texas Petroleum Corp. v. PLT Engineering*, 895 F.2d 1043, 1047 (5th Cir. 1990)).

Newfield disputes whether the first two factors are met. Thus, it argues, the contract is maritime and the indemnity agreement is therefore valid and enforceable.

### 1) Whether the Controversy Arises On a Situs Covered by OCSLA

The Fifth Circuit has stated that the OCSLA applies to the following locations:

(1) the subsoil and seabed of the OCS;
(2) any artificial island, installation, or other device if
    (a) it is permanently or temporarily attached to the seabed of the OCS, and
    (b) it has been erected on the seabed of the OCS, and
    (c) its presence on the OCS is to explore for, develop, or produce resources from the OCS;
(3) any artificial island, installation, or other device if
    (a) it is permanently or temporarily attached to the seabed of the OCS, and
    (b) it is not a ship or vessel, and
    (c) its presence on the OCS is to transport resources from the OCS.

*Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492 (5th Cir. 2002).[14]

In disputes arising from indemnity contracts the "situs determination turns on the physical location of the underlying accident." *Naquin v. Lin-Bar Marine, Inc.*, 2009 WL 649895, *3 (E.D. La. Mar. 9, 2009) (citations omitted).

---

[14]In *Demette*, the Court of Appeals for the Fifth Circuit examined a contract for casing work that resulted in an injury to a worker while performing his duties on a jack-up rig attached to the OCS. *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492 (5th Cir. 2002). The court noted that movable drilling rigs and other structures which are temporarily attached to the seabed fall within the scope of the OCSLA. The court determined that the contract was maritime, basing its decision, primarily, on the historical treatment of contracts for casing services as maritime, but also on the conclusion that the contract dealt with maritime work performed on a vessel.

In the instant case, the accidents at issue occurred on a dynamic positioning vessel. A vessel does not qualify as an OCSLA situs. *See Demette*, 280 F.3d at 497.

In *Global Industries Offshore LLC*, the court found that a dynamically positioned vessel operating on the OCS for pipe laying purposes and not for the purpose of "exploring for, developing, or producing resources" from the OCS was not subject to the OCSLA. *Global Industries Offshore LLC v. Pipeliners Local et al*, 2006 WL 724815 (E.D. La. Mar. 16, 2006). The court considered several Ruling Letters from the Department of the Treasury, United States Customs Service, noting that the vessel would not be tethered or anchored in any way to the seabed of the OCS, and concluded the vessel does not become a point on the OCS to which the state law would be extended by virtue of the OCSLA. *Id*.

Although the work in the instant case involved the removal of debris from the seabed, "the OCSLA situs requirement is not automatically satisfied simply because the contract containing the indemnity obligation is for services to be rendered at an OCSLA situs." *Naquin*, 2009 WL 649895 at * 3. There is no evidence that the vessel was attached to the seabed. Based on the lack of jurisprudence to support any argument that the dynamic positioning vessel at issue was subject to the OCSLA, the Court finds that the OCSLA does not apply to a contract dispute arising from this personal injury on the M/V TOISA PROTEUS . Thus, it appears that the contract does not satisfy the situs test, and Longnecker's Motion for Summary Judgment must be denied.

## 2) Whether Federal Maritime Law Applies of its Own Force

Whether a contract is maritime or non-maritime in nature depends "on the 'nature and character of the contract,' rather than on its place of execution or performance." *Davis &*

*Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990). A contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law. *Id*. (citing E. Jhirad, A. Sann, B. Chase, & M. Chynsky, Benedict on Admiralty, § 182 (1988)). When an event occurs on an OCSLA situs but also is governed by maritime law, maritime law controls. *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir. 1996); *Smith v. Penrod Drilling Corp.*, 960 F.2d 456 (5th Cir. 1992). Courts determine the nature of a contract by its historical treatment in the relevant jurisprudence and by an inquiry into the facts surrounding the contract. *Davis*, 919 F.2d at 316.

The *Davis* Court outlined six factual factors to consider when characterizing the contract: 1) what does the specific work order in effect at the time of injury provide; 2) what work did the crew assigned under the work order actually do; 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel; 5) what was the principal work of the injured worker; and 6) what work was the injured worker actually doing at the time of injury. *Id.* at 316 (finding that plaintiff, in overseeing crew that traveled from site to site primarily aboard a barge, repairing wells and replacing flowlines, transporting materials and building a walkway, conducted work that was maritime since contract required the use of a vessel and its crew).

Numerous Fifth Circuit cases have found that a contract to supply personnel to work on special purpose vessels is a maritime contract. *See Thibodeaux v. Vamos Oil & Gas Co.*, 487 F.3d 288 (5th Cir. 2007) (finding that personnel contracts for drilling vessels are historically treated as maritime contracts); *In re Elevating Boats, Inc.*, 2002 WL 272372 (E.D. La. Feb. 22,

2002); *Demette*, 280 F.3d at 500; *Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 549 (5th Cir. 2002) (holding that a contract for repair of a jack-up rig is maritime); *Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1120-21 (5th Cir. 1990) (holding that contracts to provide offshore casing services are maritime); *Smith v. Penrod Drilling Corp.*, 960 F.2d 456 (5th Cir.1992) (holding that contract to "work over" a jack-up rig is maritime); *Dupont v. Sandefer Oil & Gas, Inc.*, 962 F.2d 60, 62 (5th Cir. 1992) (holding that contract to supply and equip vessel was maritime).

The Fifth Circuit in *Alleman v. Omni Energy Services Corp.* recently indicated that the court must focus on the nature and subject matter of the contract, determining whether it has "reference to maritime service or maritime transactions." 2009 WL 1605596 (5th Cir. June 9, 2009). Thus, the issue the Court must resolve is whether the subject matter of the contract was maritime or non-maritime.

Longnecker claims that the jurisprudence does not support finding that a contract to deconstruct and remove a platform that is encrusted into the seabed is a maritime contract. Longnecker argues that under *Union Texas Petroleum Corp. v. PLT Engineering*,[15] the OCSLA can apply to a contract even though all the work under the contract was performed on vessels, because the subject matter of the contract is non-maritime.[16] For support, Longnecker cites the

---

[15]895 F.2d 1043 (5th Cir. 1990).

[16]Longnecker further cites *Flour*, arguing that where the subject of the contract is to deconstruct a fixed oil and gas platform that remains encrusted into the seabed, the contract is non-maritime. *Flour Ocean Services, Inc. v. Rucker Co.*, 341 F. Supp. 757 (D.C. La. 1972). In *Flour*, the suit arose out of a contract in which the plaintiff agreed to furnish the defendant with equipment for use in raising a sunken platform from the OCS.  *Id.* The court indicated that two factors led it to conclude that the controversy was subject to OCSLA: "1) The [platform] will again be used in oil and gas exploration, possibly on the [OCS]; and 2) The contract was undertaken in furtherance of

testimony of Courtney Allen Benson, vice president of response services for O'Brien's, as he stated, "The overall purpose of the project was to remove platform debris and components from the seafloor so that damage assessment, and ultimately, repairs could be made to the well head."[17]

In *PLT Engineering*, Union Texas Petroleum entered into an offshore construction contract calling for PLT Engineering to design, fabricate and install a pipeline from a platform. 895 F.2d 1043 (5th Cir. 1990). PLT Engineering then subcontracted other firms to perform the testing, inspection, welding and other services necessary to perform the contract. *Id*. Union Texas argued that the contracts were maritime because the work required services involving seamen and vessels, and the recovery of oil and natural gas was a traditional maritime activity. *Id*. Rejecting the arguments, the Fifth Circuit held that the principal obligation of PLT Engineering and the subcontractors was construction of a gathering line on the seabed of the OCS for the purpose of oil and gas exploration, a non-maritime activity subject to OCSLA. *Id*.

The determination of what constitutes a maritime contract is a highly fact–specific inquiry. *See Dupre v. Penrod Drilling Corp*., 993 F.2d 474, 1994 A.M.C. 599 (5th Cir. 1993). In *PLT Engineering*, the court focused on the fact that the principal obligation in the contract was the construction of the gathering line and connecting it to the platform and the transmission line. 895 F.2d at 1048. As these activities do not constitute traditionally maritime activities, the court

---

the requirements of a lease, granted for the purpose of developing the natural resources of the [OCS]." *Id*. at 759.

[17]Rec. Doc. No. 84-10.

found that the contract was non-maritime.[18] In the instant case, Longnecker is a company specializing in providing personnel in marine rigging operations, and at the time of the accident, Plaintiff worked for Longnecker as a rigger.[19] The focus of the contract was to provide rigging personnel and services aboard a vessel in connection with the salvaging of a platform. The law of salvage has a rich history and salvage principals date back to ancient Rhodian law. 3A Benedict on Admiralty (7th Ed. 1995) s 1. Salvage activities constitute a traditional maritime concern. *See Harrington v United States*, 748 F Supp 919, 928 (D. Puerto Rico 1990). The Court finds that the case at bar is distinguishable on that basis.

In the instant case, no work order has been provided by either party. However, it appears to be undisputed that the work order called for the use of a vessel to recover the platform. All of the work called for by the MSC was to be performed from a vessel in navigable waters. The work being done was necessary to the achievement of the vessel's mission, which was to salvage the platform. No decision had yet been made as to whether the platform would be reconstructed. At the time of injuries, Alex was doing work that involved handling a tag line connected to a basket being lowered onto the vessel's deck, or he was attaching equipment to be used in dismantling the platform to the crane. Although this *Davis* factor, regarding the work the injured worker was actually doing at the time of injury, could militate in favor of finding that the contract was non-maritime, the Court finds that on balance, the MSC at issue for the performance of services aboard a vessel was a maritime contract and the indemnity clause is

---

[18]The Court also notes that in *Flour*, the focus of the contract was also to help one party fulfill its contractual obligations to develop natural resources in the OCS. *See* 341 F. Supp. at 759.

[19]*See* Rec. Doc. No. 34-2.

valid and enforceable. Accordingly, the Court finds that the MSC is a maritime contract. Thus, federal maritime law applies of its own force, and state law is inapplicable.

### C. Whether the Wild Well and BTI are Entitled to Indemnity Under the Longnecker-Newfield contract

The Longnecker-Newfield MSC indicates that Longnecker shall indemnify the invitees of Newfield. Longnecker asserts that Wild Well and BTI are not covered by the indemnity provision of the MSC.

The United States Fifth Circuit Court of Appeals defines an "invitee" as "a person who goes onto premises with the expressed or implied invitation of the occupant, on business of the occupant or for their mutual advantage." *Blanks v. Murco Drilling Corp.*, 766 F.2d 891, 894 (5th Cir. 1985). When a contract does not specifically define "invitee," courts adopt the *Blanks* definition. *See Brown v. Sea Mar Mgmt., LLC*, 288 F. App'x 922, 924 (5th Cir. 2008).

If the contract does not specifically limit the scope of those considered to be invitees, courts broadly construe the scope. *See Reynaud v. Rowan Co., Inc.*, 1999 WL 65022 (E.D. La., Feb. 5, 1999) ("[T]he contract does not have any provision specifically defining or limiting 'Operator's invitees' . . . . it expands the scope of the parties covered under the indemnity agreement."). The scope of an invitee can include companies that are contractors or subcontractors of the parties being indemnified directly. *See Clayton Williams Energy, Inc. v. National Union Fire Ins. Co. of La.*, 2004 WL 2452780, *5 (E.D. La. Nov. 1, 2004).

In the instant case, Longnecker asserts that Wild Well and BTI do not have rights under the indemnification provision in the MSC between Longnecker and Newfield, because there is no express provision stipulating to the inclusion of Wild Well and BTI. The MSC does

not include a definition of "invitee." Thus, the Court adopts the definition of an invitee set forth in *Blanks*, and finds that Wild Well, on the M/V TOISA PROTEUS to work in connection with the overall salvage operations, was an invitee of Newfield.

Defendants assert that BTI cannot be an invitee because it was not a party to the contract between Wild Well and Newfield, and had no direct contract with Newfield. However, both Wild Well and BTI were impliedly invited aboard the vessel by Newfield. Both were present to the mutual advantage of both Wild Well, BTI and Newfield. If Wild Well is an invitee, so is BTI, as a subsidiary under Wild Well's control and working in connection with Wild Well on the salvage operations. Although the Longnecker and Newfield parties agreed not to transfer or assign any rights to a third party without the express written approval of the other party, this agreement is not inconsistent with Longnecker's agreement to indemnify Newfield's invitees. The motion at issue involves indemnification and neither Newfield nor Longnecker is attempting to assign rights. Thus, the Court finds that Wild Well and BTI are invitees and the indemnification provision in the maritime contract at issue extends to both Wild Well and BTI.

## IV.     CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Motion for Summary Judgment filed by O'Brien's Group Inc. (Rec. Doc. No. 29) be and is hereby DENIED. The Motion for Summary Judgment filed by Newfield Exploration Company (Rec. Doc. No. 84), and the Motion for Summary Judgment filed by Blowout Tools, Inc. and Wild Well Control, Inc. (Rec. Doc. No. 108) are GRANTED. The Motion for Summary Judgment filed by Longnecker Properties, Inc. (Rec. Doc. No. 85) is DENIED.

New Orleans, Louisiana this 17th day of August, 2009.

UNITED STATES
DISTRICT JUDGE